UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Criminal Action No. 5: 23-097-DCR |
| ) | |
| V. ) | |
| ) | |
| ARRON MICHAEL STRANGE, ) | **MEMORANDUM OPINION** |
| ) | **AND ORDER** |
| Defendant. ) | |

*** *** *** ***

Defendant Arron Strange is charged in Count 1 of a Superseding Indictment with possessing firearms while addicted to a controlled substance in violation of 18 U.S.C. § 922(g)(3). Strange has filed a motion to dismiss Count 1, arguing that § 922(g)(3) violates the Second Amendment to the United States Constitution. Specifically, he contends that § 922(g)(3) fails the test announced in *New York State Rifle & Pistol Ass'n v. Bruen*, which requires any restriction on conduct protected by the Second Amendment to be "consistent with this Nation's historical tradition of firearm regulation." 597 U.S. 1, 17 (2022). However, because § 922(g)(3) is consistent with the country's traditional disarmament of dangerous and untrustworthy individuals, Strange's facial challenge to the statute fails. His motion to dismiss Count 1 will be denied.

I.

On August 15, 2023, Department of Veterans Affairs ("VA") Police Captain James Bourne observed a gray Toyota parked in the VA parking garage in Lexington, Kentucky. Bourne observed that the windows of the vehicle were down and there was a large cage

containing parakeets inside.[1] As Bourne got closer, he detected the strong odor of burnt marijuana emanating from the vehicle. And upon closer inspection, Bourne saw two small "grinder boxes" in plain view and observed a shotgun through the rear window.

Bourne determined through investigation that the operator of the vehicle was Defendant Strange, who worked as a housekeeper at the VA. Bourne located Strange and asked that he accompany him to the vehicle so that they could discuss the birds. Upon arrival at the vehicle, Bourne asked Strange to place his backpack on the ground. Strange explained that he had recently purchased the vehicle and was living in it. Upon questioning, Bourne reported that he had three firearms inside the vehicle—"a 20 gauge, a .380, and a .22." Strange indicated that he had smoked marijuana prior to coming to work.

Captain Bourne removed from the cargo area of the vehicle a loaded Charles Daly 20-gauge shotgun, a loaded Bersa .380, a loaded Smith & Wesson revolver, and an unloaded Ruger .22 pistol. A further search of the vehicle produced a box containing .357 magnum cartridges, brass knuckles, an expandable baton, and two metal grind boxes containing residue. Bourne also located a partially burnt blunt containing a green leafy substance and 11 white tablets in an amber pill bottle identified as Tramadol.

Another officer searched Strange's backpack and located 25 vials of injectable medication inside a green rubber glove. These injectables consisted of Ephedrine Sulfate, Promethazine HCI, Phenylephrine HCI, Adrenalin, Droperidol, and Fentanyl. Strange did not

---

[1] These facts are excerpted from the affidavit of James Freeman, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, who swore to these facts on August 22, 2023, in support of the United States' Complaint in this case. [Record No. 1-1]

have a prescription for any of the medications. Captain Bourne observed that Strange was "sweating profusely and talking excitably" during the search.

Captain Bourne and Detective Boggs subsequently interviewed Strange, who explained that he had taken the vials of medication during his shift earlier that day. Strange initially reported that he did so because was contemplating an act of self-harm. As a result, the officers terminated the investigation and had Strange evaluated at the VA Emergency Department. A blood specimen was drawn, which tested positive for the presence for amphetamine and tetrahydrocannabinol.

Officers prepared to resume the interview after Strange was medically cleared at the Emergency Department. However, a crack pipe fell from Strange's right pant leg as he was transported back to the VA Police service area. Strange subsequently admitted that he removed the vials of drugs for the purpose of trading them on the street for other drugs that he used, namely methamphetamine. Strange also advised officers that he had taken vials of medication from the VA in the past and "essentially that this was not an isolated occurrence."

On August 17, 2023, Officers interviewed Regina Pollard, Strange's mother and fellow VA employee. Pollard stated that Strange had suffered from chemical dependency issues throughout his life and that his drug of choice was methamphetamine. She indicated that she filed a "Casey's Law Action" against Strange in the Powell County Kentucky Family Court, and that action was pending against him at the time of his arrest on August 15, 2023. Powell

also reported that similar action had been filed against Strange in the Fayette County Family Court in 2020, which resulted in an order for drug rehabilitation.[2]

On September 7, 2023, a federal grand jury returned an Indictment charging Strange with knowingly possessing firearms while knowing he was addicted to a controlled substance in violation of 18 U.S.C. § 922(g)(3). The following month, a grand jury returned a Superseding Indictment recharging Strange with the violation of § 922(g)(3) as well as a violation of possessing controlled substances (fentanyl, ephedrine, and tramadol) with the intent to distribute them in violation of 21 U.S.C. § 841(a)(1). Strange filed a motion to dismiss the charge under § 922(g)(3) on November 6, 2023.

## II.

Rule 12 of the Federal Rules of Criminal Procedure permits courts to dismiss defective indictments. An indictment that is based on a statute that is unconstitutional is defective and, therefore, must be dismissed. *See In re Civil Rights Cases*, 109 U.S. 3, 8-9 (1883) (observing that "[a]n indictment is defective if it alleges a violation of an unconstitutional statute). Strange presents a facial challenge to § 922(g)(3), as his supporting memorandum does not discuss any facts particular to his case and apparently seeks to strike down the statute in all its applications.[3]

---

[2] The Matthew Casey Wethington Act for Substance Abuse Intervention ("Casey's Law") provides a mechanism for involuntary treatment of persons suffering from alcohol and/or drug addiction in Kentucky. *See* Ky. Rev. Stat. §§ 222.430-222.437.

[3] Strange asserts factual arguments for the first time in his reply brief. Not only are parties precluded from raising new arguments for the first time in a reply brief, as-applied challenges generally are premature where ruling on them would involve consideration of facts that must be decided at trial. *See United States v. Guerrero*, 2022 WL 2079861, at *3 (E.D. Ky. June 9, 2022); *United States v. Hatfield*, 2023 WL 3244565, at *6 (E.D. Ky. May 4, 2023).

*See Green Party of Tenn. v. Hargett*, 791 F.3d 684, 691-92 (6th Cir. 2015) (distinguishing facial and as-applied challenges).

To succeed in asserting a facial challenge, the proponent must show "that no set of circumstances exist under which [the statute] would be valid." *Id.* at 691 (quoting *Speet v. Schuette*, 726 F.3d 867, 871 (6th Cir. 2013)). Facial challenges are disfavored as they "raise the risk of premature interpretation, run contrary to the fundamental principle of judicial restraint, and threaten to short-circuit the democratic process." *Warshak v. United States*, 532 F.3d 521, 530 (6th Cir. 2008) (cleaned up). Accordingly, a proponent of a facial challenge "bear[s] a heavy burden of persuasion." *Id.*

### III.

**A.   Strange is entitled to protection under Second Amendment.**

The Second Amendment recognizes "an individual right to keep and bear arms for self-defense." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 24. For regulation of such conduct to pass constitutional muster, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

The United States argues that Strange's challenge to § 922(g)(3) fails because the plain text of the Second Amendment does not cover his conduct. In other words, the government contends that Strange is not "law-abiding" or "responsible" and, therefore, he is not one of "the people" whom the Second Amendment protects.[4]

---

[4]   The government does not contend that Strange is not an American citizen or that the firearms he possessed are not "in common use." *See United States v. Heller*, 554 U.S. 570, 627

This Court recently addressed a similar argument in *United States v. Combs*, 654 F. Supp. 3d 612 (E.D. Ky. 2023). There, the Court observed that some authorities have adopted the position that only "law-abiding" citizens are entitled to protection under the Second Amendment. *Id.* at 616. This conclusion relies largely on the holding in *United States v. Heller*, 554 U.S. 570, 581 (2008), in which the Supreme Court noted that the Second Amendment elevates above all other interests "the right of *law-abiding, responsible* citizens to use arms in defense of hearth and home." *Id.* at 634 (emphasis added). *See also Bruen*, 597 U.S. at 71 (referencing "law-abiding" citizens' right to keep and bear arms).

But as this Court previously emphasized, the Supreme Court explained in *Heller* that "the people" as used in the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *Combs*, 654 F. Supp. 3d at 616-17 (citing *Heller*, 554 U.S. at 579-80). Further, the *Heller* Court began its analysis with a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. While the *Bruen* Court reaffirmed that "law-abiding citizens are part of the people protected by the Second Amendment[,]. . . [t]he issue of whether a non-law abiding citizen qualifies for Second Amendment protection was not before the Court." *United States v. Goins*, 647 F. Supp. 3d 538, 545 (E.D. Ky. 2022).

The United States urges the Court to consider Strange's alleged history of drug addiction and conclude that he is dangerous and/or irresponsible and, therefore not entitled to Second Amendment protection as informed by historical standards. However, *Bruen* instructs courts to examine whether firearm regulation is supported by historical tradition *after* engaging

---

(2008) (explaining that the Second Amendment protects only the carrying of weapons that are in "common use at the time," as opposed to those that are "highly unusual in society at large").

in a "rather simple textual inquiry" to determine whether the Second Amendment applies in the first instance. *See id.* at 547 (citing *Bruen*, 597 U.S. at 33). The government's endorsed approach conflates these two steps and renders the threshold "plain text" inquiry meaningless.

The government's preferred approach could lead to aberrant results. For example, "if some people fall entirely outside of the Second Amendment's scope, then no state action is required to disarm them." *Goins*, 647 F. Supp. 3d at 547 (citing *Kanter v. Barr*, 919 F.3d 437, 456 (7th Cir. 2019) (Barrett, J., dissenting). Construing the Second Amendment's reference to "the people" broadly and then contemplating Congress's power to disarm some groups follows *Heller*'s strong presumption that the Second Amendment belongs to all Americans and fits better within the test announced in *Bruen*. *See id.*

**B.     Section 922(g)(3) is consistent with the Nation's historical tradition of firearm regulation**.

Being unpersuaded that Strange is categorically excluded from protection under the Second Amendment, the Court considers whether 18 U.S.C. § 922(g)(3) survives *Bruen*'s historical analysis. In reaching its decision, the Court relies heavily on the reasoning in *United States v. Slone*, 2023 WL 8037044 (E.D. Ky. Nov. 20, 2023), and the United States' briefing in that case. Unlike the instant matter, the attorney representing the government in *Slone* identified specific historical laws sufficiently analogous to § 922(g)(3) to demonstrate that disarming citizens under the statute does not violate the Second Amendment.

Title 18 of the United States Code, section 922(g)(3), provides that: "It shall be unlawful for any person who is an unlawful user of or addicted to any controlled substance . . . to possess in or affecting interstate commerce, any firearm or ammunition . . . ." The term "addict" is defined as "any individual who habitually uses any narcotic drug so as to endanger

the public morals, health, safety, or welfare, or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction." 18 U.S.C. § 802(1). "Unlawful user" is not defined in the statute and the United States Court of Appeals for the Sixth Circuit has not adopted a pattern jury instruction with respect to this term. However, the Sixth Circuit has strongly indicated that to be an "unlawful user" for purposes of § 922(g)(3), a defendant must have engaged in regular use over a period of time proximate to or contemporaneous with possession of the firearm. *United States v. Burchard*, 580 F.3d 341, 346-47 (6th Cir. 2009).

In considering the defendant's challenge to § 922(g)(3), the Court must determine whether a well-established and representative historical analogue regulated firearms in a similar way. *See Bruen*, 597 U.S. at 30. While analogical reasoning under the Second Amendment is not a "blank check," the government also is not required to identify "a historical twin." *Id.* In considering whether a modern law is sufficiently analogous to a historical regulation, the Court must consider how and why the laws burden an individual's rights under the Second Amendment. *Id.* at 29.

The government argues that § 922(g)(3) is analogous to the historical disarmament of those deemed to be dangerous and untrustworthy, as well as the disarmament of the mentally ill. The Statute of Northampton of 1328 provided that, "with some exceptions, Englishmen could not 'come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure." *Slone*, 2023 WL 8037044, at *3 (quoting 2 Edw. 3 c. 3 (1328)). While

the statute did not contemplate handguns, it was used to prosecute "the act of go[ing] armed to terrify the King's subjects," which was "a great offense at the common law." *Id.* (quoting *Bruen*, 597 U.S. 43-44) (internal quotation omitted)). *See also Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (observing that, "[i]n England, officers of the Crown had the power to disarm anyone they judged to be 'dangerous to the Peace of the Kingdom'"). The Statute of Northampton survived the English Bill of Rights of 1689, which formed the predecessor to the Second Amendment. *Bruen*, 597 U.S. at 45.

Slaves and Native Americans historically were "disarmed as a matter of course" out of fear that these groups "would use guns to revolt" or otherwise threaten public safety. *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) (internal quotations omitted). The government identified colony or state laws in effect in the 18th and 19th centuries that prohibited bearing arms "in a way that spreads fear or terror among the people." A Massachusetts law provided "[t]hat every justice of the peace . . . may cause to be staid and arrested all affrayers, disturbers or breakers of the peace, and such as shall ride, or go armed offensively . . . and upon view of such justice or justices, confession of the party or other legal conviction of any such offence, shall commit the offender to prison . . . and seize and take away his armor or weapons." *United States v. Rahimi*, 61 F.4th 443, 457-58 (5th Cir. 2023) (quoting 1 *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay*, 52-53 (1869) (1692 statute). Likewise, a New Hampshire statute authorized justices of the peace to cause the offender's "weapons to be taken away." *Id.* (quoting *Acts and Laws of His Majesty's Province of New-Hampshire: In New-England*, 1; *with Sundry Acts of Parliament* 17 (1771) (1701 statute)).

Virginia's analogous law provided that: "[N]o man . . . [shall] go [] or ride armed by night or by day, in fairs or markets, or in other places, in terror of the country, upon pain of

being arrested and committed to prison by any justice on his view, or proof of others, there to a time for so long a time as a jury, to be sworn for that purpose by the said justice, shall direct, and in like manner to forfeit his armour to the Commonwealth . . . ." *Id.* (quoting *Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force* 33 (1794) (1786 statute)). And a North Carolina law required constables to "arrest all such persons as . . . shall ride or go armed offensively, or shall commit or make any riot, affray, or other breach of his Majesty's peace." *Id.* (quoting 1 *Laws of the State of North-Carolina, including the Titles of Such Statutes and Parts of Statutes of Great Britain as Are in Force in Said State* 131-32 (1821) (1741 statute)). *See also O'Neill v. State*, 16 Ala. 65, 67 (1849) (recognizing that carrying weapons for the purposes of an affray, and in such a manner as to strike terror to the people, is a punishable offense).

Strange relies on a trio of cases which held that § 922(g)(3) was unconstitutional *as applied* to the marijuana-user defendants in those particular cases. *See United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023); *United States v. Connelly*, --F. Supp. 3d--, 2023 WL 2806324 (W.D. Tx. Apr. 6, 2023); *United States v. Harrison*, 654 F. Supp. 3d 1191 (W.D. Ok. Feb. 2, 2023). These nonbinding decisions are not persuasive here. Each of the defendants in those cases was charged with possessing a firearm with knowledge that he or she was an unlawful user of marijuana. In each case, the court determined that stripping the defendant of his or her right to possess a firearm, based solely on the defendant's non-contemporaneous use of marijuana, did not comport with historical regulation of firearm possession.

The Supreme Court has plainly recognized that our Nation's history supports the constitutionality of laws disarming dangerous individuals. *See Heller*, 554 U.S. at 626. While the *Heller* Court did not undertake an exhaustive analysis of the full scope of the Second

Amendment, it noted that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings. . . ." 554 U.S. at 626-27. And it is reasonable to conclude that "[h]abitual drug abusers . . . are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Slone*, 2023 WL 8037044 at *3 (quoting *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010)). Strange has not satisfied the onerous burden of demonstrating that § 922(g)(3) is unconstitutional in all of its applications, including with respect to users and addicts of *any* controlled substance.

**IV.**

Based on the foregoing analysis, it is hereby

**ORDERED** that the defendant's motion to dismiss Count 1 [Record No. 26] is **DENIED**.

Dated: December 6, 2023.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky